United States District Court
Southern District of Texas
**ENTERED**
April 06, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY EUGENE BALCEROWICZ, JR., a/k/a LARRY MICHAEL JOHNSON, TDCJ-CID # 1672723, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. H-12-0310 |
| DAVID W. SWEETIN, *et al.,* | § § § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Larry Eugene Balcerowicz, also known as Larry Michael Johnson, a state inmate at the time of filing, filed this *pro se* section 1983 lawsuit raising claims of deliberate indifference to his health and serious medical needs against prison correctional officers Warden David W. Sweetin, Assistant Warden Christopher G. Carter, Major David Forrest, and Peggy Haggard (collectively the "Correctional Defendants), and against prison medical care providers Thomas Powell, P.A., Randall Healy, P.A., and Maureen Liles, R.N. (collectively the "Medical Defendants"). All of the named defendants are sued in their individual capacities. (Docket Entry No. 12.)

The Correctional Defendants filed a motion to dismiss (Docket Entry No. 15), to which plaintiff filed a response (Docket Entry No. 18). The Medical Defendants filed a motion for summary judgment (Docket Entry No. 24), to which plaintiff filed a response

(Docket Entry No. 26). The Medical Defendants filed a reply to plaintiff's response (Docket Entry No. 27), followed by a sur-reply filed by plaintiff (Docket Entry No. 28).

Based on careful consideration of the motions and the various responsive pleadings, the exhibits, the record, and the applicable law, the Court **GRANTS** the motion to dismiss, **GRANTS** the motion for summary judgment, and **DISMISSES** this lawsuit for the reasons that follow.

## I. BACKGROUND AND CLAIMS

Plaintiff alleges in his complaint that, on or about November 2, 2010, he arrived at the Estelle Unit from the Garza Transfer Facility. Plaintiff states that he had been evaluated by medical staff at the Garza Transfer Facility, where he reported his hearing impairment, asthma, and history of short "black out" seizures, but that he was not examined or evaluated by medical personnel upon his arrival at the Estelle Unit. He claims that he was not seen by Estelle Unit medical personnel until he suffered an asthma attack on November 9, 2010, and was treated by the medical staff and prescribed an asthma inhaler. He complained to one or more of the Medical Defendants that he had not been evaluated by Estelle Unit personnel upon his arrival, and had not received his asthma medication or any work restrictions.

Plaintiff reports that a few months later, he was assigned to work in the outdoor field squad. He reports no specific beginning date, but does state that on June 24, 2011, he complained to medical personnel that his working in the fields was causing problems with

his asthma and seizures. Plaintiff states that he also sent I-60 complaints to the Correctional Defendants complaining that he was being "worked against restrictions" in the field squad. He complains here that he was only able to get a drink of water once an hour, and that he developed headaches, "shakes," and breathing difficulties. On July 26, 2011, he asked defendant Healy for medical restrictions to keep him from working in the fields; Healy responded that medical staff cannot make work assignment decisions. The next day, July 27, 2011, plaintiff reportedly "fell out" while working the fields and "woke up" in the infirmary, claiming that he had a "space out" seizure from being outside.

As to the Correctional Defendants, plaintiff claims that Sweetin "ignored all pleas for help medical and safety. I wrote letters and requests for his help and authority power," that Carter "failed to respond and help to all pleas of help and assistance," that Forrest "refused to help me. Failed to help w/my pleas for med & safety," and that Haggard "ignored and refused to help me w/my pleas for help medically & security & safety." (Docket Entry No. 1, p. 3.) As to the Medical Defendants, plaintiff states that Powell and Healy "refused and denied me proper medical help and treatment," and that Liles "refused and denied me proper medical treatment and held against a P.A. Dr.s [*sic*] orders and advice." *Id.* Construed liberally, plaintiff's complaint raises claims against all of the defendants for deliberate indifference to his health and serious medical needs. He seeks monetary compensation and injunctive relief.

## II.  THE CORRECTIONAL DEFENDANTS

In their pending Rule 12(b)(6) motion to dismiss, the Correctional Defendants argue that plaintiff's claims against them should be dismissed because he fails to state a viable section 1983 Eighth Amendment deliberate indifference claim.

### A.    Rule 12(b)(6) Standards

In reviewing the adequacy of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014). It need not, however, accept a plaintiff's legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive dismissal under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As recognized by the Fifth Circuit Court of Appeals, the court's task "is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc).

On a Rule 12(b)(6) motion, a district court generally "must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*,

4

224 F.3d 496, 498 (5th Cir. 2000).  The court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims.  *Id.*; *see also Walch v. Adjutant General's Dep't of Tex.*, 533 F.3d 289, 293–94 (5th Cir. 2008) (considering exhibits attached to an opposition because no party questioned the authenticity of the documents and they were sufficiently referenced in the complaint to permit their consideration on a motion to dismiss). Although no documents were attached to plaintiff's complaint or defendants' motion to dismiss in the instant case, plaintiff attached documents to his response in opposition to the motion to dismiss.  The Correctional Defendants do not challenge the authenticity of the documents; to the contrary, the same documents are among those submitted by the Medical Defendants in support of their own motion for summary judgment.  Consequently, in considering the pending motion to dismiss, the Court will include the exhibits attached to plaintiff's response in opposition to the motion.

A pleading filed *pro se* is to be liberally construed, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Under this standard, pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them.  *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Oliver v. Scott,* 276 F.3d 736, 740 (5th Cir. 2000).  Because plaintiff is proceeding *pro se*, he will be afforded the benefit of liberal construction under *Haines*.

5

B.    Deliberate Indifference

Plaintiff claims that the Correctional Defendants violated his Eighth Amendment rights through deliberate indifference to his health and safety.

A claim for deliberate indifference to a prisoner's health and safety requires proof that an officer knew of and disregarded an excessive risk to the inmate's physical health or safety, and that the inmate suffered physical harm or injury as a result. The inmate must show that the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that the officer did in fact draw the inference and disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). The failure of an officer to alleviate a significant risk which he should have perceived, but did not, does not constitute deliberate indifference. Moreover, mere negligence or a lack of reasonable care which falls short of being deliberately indifferent does not give rise to a constitutional violation. *Id.* at 832–33; *Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995). To meet this standard, a prisoner must establish more than mere negligence or an unreasonable response. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

C.    Analysis

The record shows that plaintiff had been evaluated immediately prior to his transfer to the Estelle Unit, as shown by his Correctional Managed Care Intake History and Health Screening dated November 2, 2011. (Docket Entry No. 24-3, p. 22.) The form indicated that plaintiff had an asthma inhaler with him and was allowed to keep it on his person. That same

6

day, prison physician Dr. Lieninger ordered that plaintiff be given a permanent bottom bunk restriction and a prescription for his regular seizure medication.

Plaintiff's medical and prison records also show that, on November 4, 2010, his Medical and Mental Health Transfer Screening form was completed at the Estelle Unit. *Id.*, pp. 278–79.  The form noted that plaintiff was complaining of left-sided chest pain, and that he was taking phenytoin, an anti-seizure medication.  He was approved for release to general population, and was given housing restrictions. *Id.*, p. 279.  His work restrictions were noted as "12, 19, 20, 23, 25, & 27."[1]  *Id.*  On November 4, 2010, he was seen by defendant registered nurse Liles at the Estelle Unit after complaining of left-sided chest pain of two days duration. *Id.*, pp. 219.  The medical chart entry noted that plaintiff had been in a fight two days prior at the Lychner Jail. *Id.*  Plaintiff was provided a cold pack and ibuprofen, and was returned to his cell.

Thus, plaintiff's allegations and his medical records show that he was provided an intake evaluation, work restrictions, housing assignment and bunk restrictions, as well as prescriptions for his regular medications.  He was allowed to keep his asthma inhaler on his person.  He was seen, evaluated, and treated for complaints of muscle pain in his chest two days after his arrival at the Estelle Unit.

---

[1]These restrictions included:  no climbing, no work in direct sunlight, no temperature extremes, no work with chemicals or irritants, and no work around machines with moving parts.

7

Plaintiff asserts that unidentified persons assigned him at an unidentified time to work in the fields. In arguing that the Correctional Defendants were deliberately indifferent to his health and safety, he states that they were aware of his hearing impairment and had knowledge of facts "from which they could infer that plaintiff's assignment to work in the fields would expose him to a substantial risk of serious harm." (Docket Entry No. 18, p. 3.) Specifically, he argues that his hearing impairment could have resulted in his being shot by armed guards if he were to venture out of bounds and not hear their warnings. *Id.* Or, he continues, he could not hear shouts to "move out of the way" of a falling tree. *Id.*, p. 4. However, plaintiff does not allege in his complaint that the defendants knew, or could infer from known facts, that plaintiff's field work exposed him to a serious risk of being shot or struck by falling trees and that they deliberately disregarded those risks. Rather, plaintiff claims that working in the hoe squad caused him to overheat, and that the Corrections Defendants deliberately ignored the substantial risk of his overheating if assigned to the hoe squad.

Plaintiff makes no correlation between his hearing impairment and a substantial risk of overheating. That is, he fails to allege facts showing that defendants could infer, from their knowledge of his hearing impairment, that his working in the fields would expose him to a substantial risk of serious overheating. To the contrary, plaintiff sets forth no factual allegations establishing that, at the time he was assigned to the hoe squad, the Correctional Defendants knew that the work assignment would expose plaintiff to an excessive risk of

overheating and that they disregarded that risk. He further fails to allege and show that the Correctional Defendants were both aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they drew the inference.

At some point after his assignment to the hoe squad, plaintiff sent an internal communication to the Unit Classification Committee, stating his belief that the work was dangerous for him because of his hearing impairment. He was not removed from the work assignment. *Id.*, pp. 5–6. Plaintiff did not inform anyone that he was experiencing physical problems working in the heat until July 26, 2011, following his claim that he had experienced a seizure while working outside, despite having purportedly taken his anti-seizure medications.[2] He complained to staff immediately after the alleged seizure that he "should not be outside working and needs restrictions changed." (Docket Entry No. 18, p. 25.) His physical examination revealed "chest clear, no wheezes, not on resp rx," "no tremors, good gait, no leg edema or atrophy." The nursing staff noted no seizure activity. *Id.*, p. 21. His respirations were "even & unlabored" when he was brought in from the field. *Id.*, p. 25. On July 27, 2011, his medical care providers added a work restriction for "no work in direct sunlight." (Docket Entry No. 26, Exhibit H.) Plaintiff does not claim that he was required to work outside in the field squad after that date.

---

[2]Plaintiff's medical care provider ordered that, as of that day, medical personnel were to actually watch plaintiff take and swallow his medications. (Docket Entry No. 18, p. 20.)

Plaintiff fails to allege facts showing that the Correctional Defendants knew, or could infer from their existing knowledge, that his working in the fields would expose him to a substantial risk of serious overheating or seizure activity, and that they disregarded that risk. He further fails to allege and show that the Correctional Defendants were both aware of the facts from which such inference could be drawn that a substantial risk of serious harm existed, and that they drew the inference.

Plaintiff does not state a viable Eighth Amendment claim for deliberate indifference as to the Correctional Defendants, and the Correctional Defendants are entitled to dismissal of plaintiff's claims against them.

### III.   THE MEDICAL DEFENDANTS

The Medical Defendants move for summary judgment and argue that plaintiff fails to establish an Eighth Amendment violation for deliberate indifference to his serious health and medical needs.

A.      Summary Judgement Standards

Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).   There is no issue for resolution at trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).   The moving party may satisfy its burden by negating the existence of an essential element of the nonmoving party's

case. *Celotex Corp.*, 477 U.S. at 325. Alternatively, if the moving party will not bear the burden of proof at trial on a particular issue, it may meet its initial burden by pointing out the absence of evidence supporting that element of the nonmoving party's case. *Id.*; *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996); *Transamerica Ins. Co. v. Avenall*, 66 F.3d 715, 718–719 (5th Cir. 1995).

Once the moving party has carried its burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996). The nonmoving party cannot discharge its burden by alleging legal conclusions or unsubstantiated assertions, nor can it rest on the allegations of the pleadings; instead, it must present affirmative evidence in order to demonstrate the existence of a genuine issue of material fact and defeat a motion for summary judgment supported by competent evidence. *Anderson*, 477 U.S. at 248–250; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* However, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment. *Id.*

11

B.     Deliberate Indifference

Under the Eighth Amendment, prison officials have a duty to provide adequate medical care to prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). To allege an Eighth Amendment violation, an inmate must show that prison officials or prison medical care providers acted with deliberate indifference toward his serious medical needs, resulting in the unnecessary and wanton infliction of pain. *Id.*

To prevail under the "extremely high standard" of deliberate indifference, a prisoner "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "An incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Id.* Moreover, "unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Id.*

Deliberate indifference is especially difficult to show when, as here, the inmate has been provided with ongoing medical treatment. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). The decision not to provide additional or different treatment "is a classic example of a matter for medical judgment" rather than a basis for a deliberate indifference claim. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Domino*, 239 F.3d at 756. An inmate's

12

disagreement with medical treatment does not state a claim for deliberate indifference. *Gobert*, 463 F.3d at 346–47; *Norton v. Dimizana*, 122 F.3d 286, 292 (5th Cir. 1997). Records showing that an inmate was given medical examinations, treatments, and medications may rebut an inmate's allegations of deliberate indifference in denying or delaying medical care. *See Varnado v. Lynaugh*, 920 F. 2d 320, 321 (5th Cir. 1991).

C.    Analysis

Plaintiff contends that the Medical Defendants were deliberately indifferent to his health and serious medical needs in denying him medical care and appropriate work restrictions. He claims that, due to their deliberate indifference, he sustained an asthma attack and, later, a seizure or episode of overheating while working outside in the field squad. He asserts that defendants' knowledge of his hearing impairment and history of a seizure disorder was sufficient to put them on notice that he should not work outside in the fields.

In support of their motion for summary judgment, the Medical Defendants have submitted an affidavit of Steven Bowers, M.D., who reviewed the medical records of plaintiff and testified as follows:

> An Intake History and Health Screening form was completed on November 2, 2010, and was signed by [plaintiff]. The Intake History and Health Screening form requests various information such as the patient's family medical history, the patient's personal medical history, the dates and types of treatment received, history of hospitalization, if the patient has any current medical, mental health or dental complaints, if the patient has used illegal drugs or alcohol, current medications, and a visual exam, etc. [Plaintiff's] Intake form noted that he had asthma, a back injury, a fish allergy, seizures, that he wore glasses and a hearing aid, he had a prior head injury, a problem with his right wrist, and a history of mental illness. In section A of the intake form, the

13

writer noted [plaintiff] had an inhaler, KOP (keep on person), for his asthma; and that he was on medication for his seizures. The same day [plaintiff] entered the Texas Department of Criminal Justice, Licensed Vocational Nurse (LVN) Gomez received verbal orders from [a physician] for [plaintiff] to have a permanent bottom bunk restriction on his HSM-18 form and for the patient to be started on Dilantin 100mg (seizure medication), three capsules every evening, with 11 refills.

[Plaintiff] arrived at the Estelle Unit on November 4, 2010. He was seen in the clinic by Registered Nurse (RN) Liles the day of his arrival for complaints of chest pain from a fight he had two days ago at Lynchner jail. The patient indicated that it hurt under his chest in the ribcage area. RN Liles noted the area was tender to palpation, there was no obvious bruising or deformities, and that the patient indicated he had pain with inhalation with no radiation of pain. [Plaintiff] was given Ibuprofen 200mg three times a day for three days and instructed to submit a sick call request if the problem persisted after three days of medication. There is nothing in the medical record that indicates [plaintiff] had any complaints regarding his asthma or that he requested an inhaler. On November 8, 2010, Donna Stebbins sent an email to the Estelle Scheduling Group stating, "Please schedule CCC (Chronic Care Clinic) for Seizure D/O (disorder) ASAP also HSM-18 (Health Unit for Classification form) update."

On November 9, 2010, [plaintiff] was seen in the clinic by RN Calyen for complaints of pain to his left chest area. The patient reported getting into a fight two weeks ago at a county jail. The examination showed the patient's oxygen saturation level was 97% (normal), and that he had wheezy breath sounds. PA Powell was asked to come assess the patient. PA Powell ordered an Albuterol Unit Dose Nebulizer treatment at that time and a Proventil Inhaler was ordered KOP. The patient was instructed to increase his fluid intake and to return to the clinic if the wheezing worsened. Ibuprofen was also ordered for his chest pain. There is nothing in the record that indicates [plaintiff] had an asthma attack on November 9, 2010, only that he had asthmatic symptoms. PA Powell prescribed the appropriate medical treatment to [plaintiff] and no further complaint was received regarding this issue for the remainder of 2010.

Upon entry to TDCJ [plaintiff] was referred to Assistive Disability Services (ADS) for his loss of hearing. His first appointment was scheduled for November 23, 2010 and he was a no show for his appointment. He was also a no show on December 13, 2010, December 14, 2010, January 5, 2011, January 10, 2011, January 25, 2011, March 7, 2011, March 24, 2011, August

2, 2011, and January 24, 2012. The patient was not seen for the first time by ADS until August 5, 2011. The caseworker noted the patient appear[ed] to have moderate to severe hearing loss and can hear better when facing the person speaking. It was also noted the patient appears to have some difficulty with speech and a delayed response to questions. The record noted the patient was provided information on developing program goals, available through ADS, program management, patient rights, and methods of communicating with his caseworker. The caseworker determined that the patient currently had no ADS needs and that his case management would be reviewed every 180 days.

It should be noted that [plaintiff] was scheduled for a Chronic Care Clinic appointment for his seizures and to update his Health Unit for Classification form (HSM-18) on December 20, 2010, but he was a no show for the appointment. PA Powell requested that the patient be rescheduled for the appointment.

On January 14, 2011, [plaintiff] was seen in the clinic by Licensed Vocational Nurse (LVN) Phlegm for complaints that he had an asthma attack earlier and officers wanted him to be checked. It was noted that the patient had a cough but that his lungs were clear, his oxygen saturation level was 98%, and that his peak flow readings were normal at 400, 375, and 400. LVN Phlegm consulted with RN Liles and the patient was instructed to drink plenty of fluids, avoid factors which trigger an attack (strong odors, smoke, etc[.]), and to return to the clinic as needed.

On January 25, 2011, PA Powell changed [plaintiff's] evening medications to the morning pill window, per the patient's request, due to his work schedule being from 10:00pm [to] 6am but noted that the patient had not had any Dilantin for 20 days. PA Powell requested that RN Lackey notify the patient of the change and the need to comply with his medications. On February 14, 2011, PA Powell renewed [plaintiff's] prescription for a Proventil Inhaler.

On April 13, 2011, [plaintiff] was scheduled for a Chronic Care Clinic appointment, an HSM-18 update, and follow-up for his seizure disorder but he was a no show for his appointment. PA Healy requested that the patient be rescheduled within the week. On April 22, 2011, [plaintiff] was again a no show for his clinical appointment. On April 22, 2011, PA Healy noted that [plaintiff] had been a no show for two Chronic Care Clinic appointments and that the patient had very poor compliance with his seizure medication. PA

Healy's plan of care was to discontinue the Dilantin due to the patient's noncompliance with the recommended treatment plan, and to reschedule for Chronic Care Clinic in 90 days. On April 27, 2011, PA Powell renewed the patient's prescription for Dilantin.

On June 28, 2011, [plaintiff] submitted a sick call request to see the doctor in the Chronic Care Clinic about his asthma and seizures. He was informed that he had an appointment already scheduled.

On July 26, 2011, [plaintiff] was seen in the Chronic Care Clinic by PA Healy. PA Healy noted that the interview was conducted by him writing to the patient and that the patient was able to respond verbally. The patient claimed that he had been on seizure medication since he was 12 and that his last seizure was two weeks ago. The examination showed the patient's lungs were clear with no wheezes, and that he was not currently on an inhaler, that his right wrist exam was within normal limits, no tremors were noted, cranial nerves 2-12 grossly intact, he had a good gait, and no leg edema or atrophy. PA Healy's plan of care was continue low bunk restriction; a classification notation for permanent chronic medical conditions – seizures; that there was no need for an asthma Chronic Care Clinic at that time [*sic*]; changed Dilantin to evenings pursuant to the patient's request; a follow-up Chronic Care Clinic appointment in one year; no repetitive use of hands, no work in direct sunlight, and no temperature extremes work restrictions to the patient's HSM-18 form; Dilantin level testing; and prescriptions for Ibuprofen 600mg (for wrist pain) and renewal of Dilantin (for seizures).

On July 27, 2011, [plaintiff] was brought to the Estelle Unit emergency room after officers found him sitting on the ground. The nurse noted the patient was alert and oriented times three, that his respirations were even and unlabored, his skin was warm and moist, and that no injuries were noted. The patient complained of a headache and indicated that he should not be outside working and he needs his restrictions changed. The patient was then seen by PA Healy. PA Healy noted that the patient was deaf and had a seizure disorder; that the patient had been assigned to the field squad, and that he may have had a mild seizure outside today but that no seizure activity had been noted by the nurses. PA Healy added a sedentary work only and no work in direct sunlight restrictions to the patients HSM-18 form.

On August 10, 2011, [plaintiff] was seen in the clinic by PA Powell for complaints of seizures, zone-out episodes, headaches, and blurred vision. PA

16

Powell's examination of the patient was normal except for decreased sensation noted in his forehead and check; decreased hearing in both ears; sensory was normal except for V1, V2, and V3 (sensory branches of the 5th cranial nerve supplying the upper, middle and lower face) on the left with a slight decrease; and his grip was weak in the right (history of fractured wrist) with the remainder of his motor skills being normal. PA Powell's assessment was seizure disorder. The plan of care was for the patient to continue taking the Dilantin for seizures; keep well hydrated; to keep a log book of seizures (time, type, and how long); follow-up in one week with log book; laboratory work up (CMP, CBC, and Dilantin level testing); and prescriptions for Ibuprofen 800mg and an antacid. Dilantin level testing was performed on August 10, 2011 and was a 9.2 ug/ml, which is slightly below the recommended therapeutic range (10–20). On August 18, 2011, [plaintiff] was seen by PA Powell for follow-up on his seizures. The log book showed the patient had four episodes during the past week with his symptoms best described as Petit Mal, or absence seizures (tongue rolling and lip biting). Absence seizures are characterized by a brief impairment of consciousness, which usually lasts no more than a few seconds. PA Powell increased [plaintiff's] Dilantin to 400mg per day and a follow-up appointment in two weeks. Dilantin level testing performed on August 30, 2011, showed the patient's level was a 16.1 ug/ml which is within the therapeutic range. On August 31, 2011, [plaintiff] was seen by PA Powell for a referral for evaluation and a referral to audiology for a hearing test. PA Powell noted the patient's speech is understandable; that the patient reads lips; and that he does not have some hearing. PA Powell's examination noted the patient's left eardrum was perforated. PA Powell referred the patient to audiology for hearing testing and for an intake physical.

On September 13, 2011, [plaintiff] submitted a sick call request with complaints of severe headaches and pains from his blackout seizures. On September 14, 2011, [he] was seen by PA Healy for a physical examination. It is noted the patient had no complaints of blackout, syncope, or face numbness at that time; appeared well rested; normal gait and stance; sits/stands with ease; no tremors; not icteric (jaundice); and that the patient requested Ibuprofen for his headaches. PA Healy's plan of care was to add a no work exposure to loud noises restriction to the patient's HSM-18 form and a prescription for Ibuprofen 800mg twice a day.

On October 3, 2011, [plaintiff] was seen in sick call by PA Powell for complaints of wrist pain since September 2010. The patient stated his wrist was in a cast for six weeks, removed, and then he received no further

17

treatment. [Plaintiff] relates that he requested that the Nurse Manager look into the fact this [*sic*] his restrictions were not complied with and that he did not request to be seen for his wrist. The record notes the patient declined the exam. PA Powell discussed restrictions and the fact that medical only assigns recommendations for restrictions and not specific job assignments.

On January 30, 2012, [plaintiff] had an ADS case management interview. During the interview, the patient indicated that he had been missing lay-ins and needs to be shaken awake. The patient was advised that he is not currently eligible for adaptive aids because he must have his hearing tested to determine eligibility. Plaintiff reported that he was scheduled on November 17, 2011 for hearing testing but was a no show for the appointment because he was not aware of it. The caseworker noted that she was going to contact the unit major to discuss.

On February 24, 2012, [plaintiff] was seen in the Estelle Unit emergency room for complaints of a seizure and head wound. At first, the patient indicated he had a seizure. A 3cm long wound was noted between the patient's eyes with scratches on his face, neck and both lips so security was called in to take pictures. The patient's wounds were treated, and he remained alert and oriented without any neurological changes, and was then released to security.

On April 1, 2012, the patient was escorted to the clinic for complaints of blurred vision, seizures, numbness, and head pain. The record notes that when the patient entered the clinic he asked, 'What is this for, I put in to see the doctor?' The nurse noted the patient became angry and showed aggression when he was asked why he was being seen. The patient was informed that there was not a doctor there today, and that the nurse could see him and then refer him to a provider, if necessary. During this episode, the nurse noted the patient had no distress or respiratory problems. The patient indicated he wanted to refuse the appointment and was escorted back to his cell.

On July 31, 2012, [plaintiff] was seen by Dr. Robertson in the Chronic Care Clinic for follow-up for his seizures and asthma. Dr. Robertson noted that the patient was only 71% compliant with his medication, and he complained of a seizure a few weeks ago, that he complained of shortness of breath and wheezing, and a history of a closed head injury as a child. Dr. Robertson's examination of the patient was within normal limits. Dr. Robertson's plan of care was a laboratory work-up including Dilantin level testing, a complete blood count, complete metabolic panel, and lipids; a prescription for Motrin

800mg, Proventil Inhaler, Atrovent Inhaler, an antacid; and a dental consult for a night guard for teeth.

In summary, [plaintiff's] claim that he did not receive an intake physical is not accurate. The record shows that on November 2, 2010, an Intake History and Health Screening form was completed. This form indicated that [plaintiff] came into TDCJ with an inhaler and was allowed to keep it on his person. That same day, Dr. Lieninger ordered that [plaintiff] was to be given a permanent bottom bunk restriction on his HSM-18 form and a prescription for Dilantin 100mg (seizure medication), three capsules every evening with 11 refills. [Plaintiff] claims that he had an asthma attack on November 9, 2010 but the medical record does not support his claim. The record shows his oxygen saturation level on November 9, 2010 was at a normal level (97%) and his peak flow readings were normal. During this visit, PA Powell prescribed an Albuterol Inhaler and instructed the patient to return to the clinic if his symptoms worsened.

[Plaintiff] was scheduled for the Chronic Care Clinic on three separate occasions (December 20, 2010, April 13, 2011 and April 22, 2011) to be examined and to have his HSM-18 form updated but he was a no show for these appointments. [Plaintiff] claims that he was denied medical restrictions but his failure to appear for his scheduled Chronic Care Clinic appointments delayed any review of his work restrictions. Medical personnel are not responsible for job assignments and they only provide medically indicated work restrictions. After [plaintiff] began to experience difficulty working in the fields in July 2011, PA Powell and PA Health [sic] modified his work restrictions.

My review of the medical record shows RN Liles only saw the plaintiff on two occasions. On each of these occasions, RN Liles performed an examination of the patient, completed the nursing protocol, and followed the protocol appropriately based on her examination findings.

(Docket Entry No. 24, Exhibit C, pp. 2–8.)   Bowers further testified that,

My review showed that between the time [plaintiff] entered TDCJ on November 2, 2010 and July 31, 2011, he only submitted seven sick call requests. One requested a pill window pass, one requested a change in time for him to receive his medication, one requested a refill for his inhaler which was given, one requested new glasses, one requested that his seizure

medication be renewed which was given, one requested the name of his seizure medication, and the last requested a Chronic Care Clinic appointment for his asthma and seizure.

*Id.*, p. 8.

In his pleadings, plaintiff specifically alleges that, on August 16, 2011, he had a small, forty-second "space out" seizure and went to the infirmary so it could be documented. He was escorted by a prison officer. When they arrived at the infirmary, defendant Maureen Liles, R.N., told the officer to return plaintiff to his cell because if he could "walk and talk," there was nothing she could do. (Docket Entry No. 26, p. 3; Docket Entry No. 28, p. 2.) Plaintiff complains that defendant Liles's refusal to see him resulted in lack of medical documentation that he had a seizure on that date. However, according to the prison's response to plaintiff's step 2 grievance, officers had neglected to inform Liles that plaintiff only wanted to document the episode, not seek treatment. (Docket Entry No. 26, Exhibit A.) Regardless, plaintiff was seen in clinic two days later on August 18, 2011, and was able to have his seizure episode documented and his medication increased. (Docket Entry No. 26, Exhibit A.) Plaintiff fails to establish that defendant Liles caused him any injury or harm by not seeing him on August 16, 2011.

Plaintiff fails to present probative summary judgment evidence demonstrating that Liles was deliberately indifferent to his serious medical needs, and the Medical Defendants are entitled to dismissal of plaintiff's claims against her.

Plaintiff further argues that defendant Thomas Powell, P.A., was deliberately indifferent to his health and serious medical needs by not renewing a prescription for plaintiff's asthma inhaler. He asserts that Powell examined him on November 9, 2010, following an episode of asthma, and prescribed him an inhaler for ninety days. He further asserts that a nurse gave him an inhaler in February of 2011, but that Powell refused to renew the prescription when the inhaler ran out.

Plaintiff's medical records show that, on November 9, 2010, Powell prescribed Proventil for plaintiff, with two puffs to be taken four times a day for ninety days. Plaintiff was allowed to keep the inhaler with him at all times, a policy known as "Keep on Person," or KOP. Even so, plaintiff's compliance with his inhaler usage was recorded as only 28%. (Docket Entry No. 24, Exhibit A, p. 5; Exhibit B, pp. 214–18.)  When the prescription expired in February 2011, Powell renewed the prescription for another ninety days. *Id.,* Exhibit A, p. 5. Plaintiff submitted a "sick call request" for a new inhaler shortly after Powell ordered the refill, and was informed that the new prescription was valid until May 2011. Plaintiff's compliance with this renewal prescription was recorded as 37%. *Id.*

Plaintiff sent no further sick call requests to Powell regarding inhaler refills after the prescription expired in May 2011. *Id.,* Exhibit B, pp. 226–238. To the contrary, plaintiff states that he sent an *e-mail* requesting a renewal to *defendant Randall Healy.*  Nevertheless, plaintiff argues that Powell should have automatically renewed the prescription in May 2011 without waiting to hear from plaintiff. In support of his argument, plaintiff proffers nothing

21

more than his bare assertion that chronic care medications such as asthma inhalers should be automatically renewed every ninety days, even if not requested by the inmate. Stated differently, plaintiff contends that it is the care provider, not the inmate, who is responsible for ensuring medication compliance. Plaintiff fails to direct this Court to any applicable authority supporting his position. Nor does plaintiff show that the non-automatic renewal of his inhaler prescription in May 2011 caused him any injury or harm. Plaintiff fails to show that defendant Powell was deliberately indifferent to plaintiff's health or serious medical needs in not automatically renewing his inhaler prescription.

Plaintiff further claims that defendant Powell was deliberately indifferent to his health and safety needs in not examining him and giving him work restrictions upon his arrival at the Estelle Unit. In particular, plaintiff asserts that Powell failed to provide work restrictions based on his hearing impairment that would have excluded his working outside in the fields.

According to medical and prison records submitted by defendants, plaintiff underwent a Correctional Managed Care Intake History and Health Screening on November 2, 2011. (Docket Entry No. 24-3, p. 22.) The form, which was signed by plaintiff, indicated that plaintiff reported a personal history of asthma and paranoid schizophrenia and complained that his "wrist is out of place." *Id.* He was given a "routine referral" to medical and mental health. *Id.*, p. 23. The records also show that plaintiff underwent a Correctional Managed Care TB History and Classification, Immunization Review, and Intake Interview that same

22

day. *Id.*, pp. 41–44.  These forms and interviews clearly evince inquiries regarding lab testing, immunizations, and authorizations to test and immunize. *Id.*

On November 4, 2010, a Medical and Mental Health Transfer Screening form was completed at the Estelle Unit regarding plaintiff. *Id.*, pp. 278–79.  The form noted that plaintiff was complaining of left-sided chest pain, and that he was taking phenytoin, an anti-seizure medication.  He was approved for release to general population, and was given housing restrictions of "IIB-2? C-2? [*sic*]" *Id.*, p. 279.  He was provided a lower bunk restriction. *Id.*, p. 226.  Significantly, his work restrictions were noted as "12, 19, 20, 23, 25, & 27." *Id.*  Thus, plaintiff is incorrect in asserting that he was not provided work restrictions upon his arrival at the Estelle Unit.  According to the records, Powell first saw plaintiff on November 9, 2010, at which point plaintiff's medical and work restrictions had already been determined.  Powell did not learn about plaintiff's work assignment complaints until October 3, 2011, at which time Powell informed him that "medical only assigns recommendations for restriction and not specific job assignments." *Id.* at 45.

Plaintiff fails to present probative summary judgment evidence demonstrating that Powell was deliberately indifferent to his health or serious medical needs, and the Medical Defendants are entitled to dismissal of plaintiff's claims against him.

Plaintiff also raises deliberate indifference claims against defendant Randall Healy, P.A.  He alleges that Healy failed to modify his work restrictions or provide proper medications and/or refills of medications, resulting in physical injury.  Specifically, plaintiff

alleges that he saw Healy on July 26, 2011, and told him about the problems he experienced working in the field. Plaintiff complains that, instead of changing his medical restrictions, Healy told him to take breaks while in the field. As shown by the medical records and Dr. Bowers's affidavit, Healy examined plaintiff and found no abnormalities. He also changed the timing of plaintiff's Dilantin dose at plaintiff's request. Work restrictions were added to plaintiff's HSM-18 form for no repetitive use of hands, no work in direct sunlight, and no temperature extremes. Dilantin level testing was ordered, and plaintiff's prescriptions for Ibuprofen 600mg and Dilantin were renewed.

Plaintiff does not demonstrate that Healy refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs. *Domino*, 239 F.3d at 756. Plaintiff's disagreements with Healy's decisions as to renewing or not renewing his prescriptions does not constitute deliberate indifference. *Varnado*, 920 F.2d at 321. Moreover, Healy added restrictions to plaintiff's HSM-18 form on July 26, 2011, including restrictions against working in direct sunlight or temperature extremes. It is undisputed that medical personnel can issue work or medical restrictions, but that job assignments are made by prison officials.

Plaintiff fails to present probative summary judgment evidence demonstrating that Healy was deliberately indifferent to his health or serious medical needs, and the Medical Defendants are entitled to dismissal of plaintiff's claims against him.

24

## IV.  INJUNCTIVE RELIEF

Plaintiff reports that he has been released from prison and is no longer incarcerated. His requests for injunctive relief regarding his conditions of confinement are **DENIED AS MOOT**.

## V.  CONCLUSION

The motion to dismiss filed by defendants Warden David W. Sweetin, Assistant Warden Christopher G. Carter, Major David Forrest, and Peggy Haggard (Docket Entry No. 15) is **GRANTED**, and plaintiff's claims against them are **DISMISSED WITH PREJUDICE** for failure to state a viable claim for which relief may be granted under section 1983.

The motion for summary judgment filed by defendants Thomas Powell, P.A., Randall Healy, P.A., and Maureen Liles, R.N. (Docket Entry No. 24) is **GRANTED** and plaintiff's claims against them are **DISMISSED WITH PREJUDICE**.

Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the _____ day of April, 2017.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

25